L. C. Binford v. Commissioner.
Binford v. Commissioner
Docket No. 4386.
United States Tax Court
1945 Tax Ct. Memo LEXIS 159; 4 T.C.M. (CCH) 649; T.C.M. (RIA) 45218; June 18, 1945
Clarence D. Phillips, Esq., for the petitioner. Byron M. Coon, Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: Petitioner contests a deficiency in income tax for the year 1941 in the amount of $2,365.20. He alleges that the respondent erred in including in his income all the profits from the operation of "Jack and Jill's Tavern. *160 " Findings of Fact Petitioner, during the taxable year, was a resident of Portland, Oregon, where he has resided since 1925. He filed his Federal income tax returns with the collector of internal revenue for the district of Oregon at Portland, Oregon. Therein he included, as income from partnership, $11,241.31, his wife including, as income from the same source, $6,960.64. In or before the year 1927 petitioner became the sole owner and operator of a tavern and night club situated on Stark Street three miles east of the corporate limits of Portland, Oregon, known as Jack and Jill's Tavern. He owned the building in which the tavern was located and about two acres of ground surrounding it. He also owned a residence situated about two blocks from the tavern in which he and his first wife resided. The tavern was operated for the purpose of serving chicken dinners and furnishing dancing and entertainment. Originally it served only food; but subsequently a bar was added and liquor was sold. In 1934 petitioner was admitted to the bar in Oregon and since that date he has engaged some in practicing law. His net income from that source, as disclosed by his returns of income, was a loss *161 of $22.04 in 1937, profit of $823.04 in 1938, loss of $185.09 in 1939 and profit of $1,030.76 in 1940. Sometime in 1933 petitioner and his first wife separated. They were divorced in 1935. In 1933 petitioner met Dorothy Lutz, who had had some experience in dramatics, singing and dancing. He became affianced to her at an undisclosed time and they were united in marriage in January, 1936. In the latter part of 1933 Dorothy began working at the tavern as a hostess and soloist and as time went by she began to assist in the management and buying end of the business. At the time she came to the tavern the entertainment consisted only of an orchestra; but there was also a floor for dancing. Dorothy expanded the entertainment, which helped to build up the business. She employed entertainers and dancing girls, had rehearsals and made up the programs. Thereafter the entertainment consisted of the orchestra, dancing, tapdancing, singing, etc., and was called the "Elations", or Jack and Jill's Elations. Dorothy was not paid regular compensation by Jack and Jill's; but she made her home at petitioner's residence and he supplied her with all living expenses out of his own personal funds. In *162 1934 petitioner's brother, Earl M. Binford, came to Portland and started to work at the tavern. He was a cook and was placed in charge of the kitchen, his wife, petitioner's sister-in-law, supervising the food. In 1935 some trouble arose in the operation of the tavern, due to a claimed violation of the law and its state liquor license was revoked. Petitioner, who was then practicing law, felt and was advised by a member of the State Liquor Commission that the operation of a night-club might be somewhat embarrassing and interfere with his profession. He therefore proposed to his brother that he take over the responsibility of having the liquor license in his name, to which Earl agreed. In order to obtain a liquor license it was necessary under the laws of the state that the applicant be the legal owner of the business. It was decided that petitioner would transfer the legal title to the business, all equipment, furniture, etc., to his brother who would operate it on a percentage basis. On November 1, 1935, petitioner executed and delivered to Earl a bill of sale, the stated consideration being " $1 and other value", purporting to transfer to him "All of the Personal Property and *163 equipment used in the operation of Jack and Jill's Tavern, located at 16321 Base Line Road, County of Multnomah, Portland, Oregon and the business and good will known as Jack and Jill's Tavern." Petitioner knew that one of the requirements of the law and of the State Liquor Commission was that the business be owned by the one in whose name a license was to be issued; that the commission would not issue a license to a trustee; and that if there was a principal "the principal must also be named, which would defeat the very purpose." It was therefore agreed that Earl "would as a confidential matter operate it [the business] on a percentage arrangement and give * * * [petitioner] all of the profits." The percentage arrangement was that Earl was to receive 5 per centum of the gross sales from food and cover charges and his [Earl's] wife Vera, who was to have full charge of the bar, should receive 10 per centum of the gross income from its operation. (The fiduciary returns hereinafter referred to indicate that Earl's percentage was calculated upon the basis of gross profit rather than gross sales.) After the marriage of petitioner and Dorothy and up to and including the taxable *164 year she was occupied chiefly with her domestic duties - three children being born within four years - and spent little time at the tavern. Inasmuch as she lived within two blocks of the tavern it was convenient for her to drop in, which she did frequently. She also occasionally attended informal meetings of the personnel and sometimes made suggestions about entertainment and other matters of business. After the execution of the bill of sale to Earl he took over the management of the business and operated it as though it were his own. Each year up to and including the taxable year he filed fiduciary returns of income on Form 1041 as "Earl M. Binford, Doing Business as Jack & Jill's Tavern" (or Elations). In these returns he showed total sales and net income as follows: Year
Total Sales
Net Income
1936
$36,807.12
$ 6,461.16
1937
41,951.44
4,891.43
1938
33,529.31
3,155.15
1939
44,063.05
5,451.98
1940
70,216.89
12,388.07
1941
94,421.59
18,201.95
The amounts shown in the third column (except for 1941) were shown as belonging to petitioner as beneficiary. They were included in his gross income for the respective years either as income from fiduciaries *165 or income from partnerships. In Earl's fiduciary return for 1941 the taxable income was shown to belong, $11,241.31 to petitioner and $6,960.64 to Dorothy Binford. The fiduciary paid no tax in any of the years. No real estate was ever conveyed by petitioner to his brother Earl. However, in the returns filed by him as fiduciary he deducted from gross income depreciation on buildings, improvements and replacements in sizeable sums. The aggregate amount deducted in 1941 was $1,359.38. Total expenses of $52,570.55 were deducted in this year, including entertainment expense of $20,056.35, wages $8,646.35, heat and light $1,516.29, telephone and postage $637.44, advertising $3,389.29, office $2,043.80, insurance $914.19, janitor service $918.45, repair to building $859.15, laundry $1,887.08, replacements $1,547.55 and service of trustee $3,523.62. On April 4, 1941, petitioner, by deed executed as of that date, conveyed to his wife Dorothy a one-half interest in the real estate consisting of two acres of ground and building occupied by Jack and Jill's Tavern for the purpose of creating an estate by the entirety and by the same deed a similar estate in the family residence which they occupied *166 was transferred. This deed was delivered to her about the same time that it was executed; but it was not recorded until January 2, 1942. At about the time that petitioner deeded the real property to his wife he told his brother that he was giving her a one-half interest in the business of Jack and Jill's Tavern and that in the future he [Earl] would be operating the business for both of them. Petitioner also told his secretary that he was giving his wife one-half of his real property and one-half of Jack and Jill's Tavern, and statements to the same effect were made to Frederick M. Sercombe, an attorney with whom he shared offices. No formal conveyance of an interest in the business was ever made to the wife. Petitioner did not file a gift tax return at the time the alleged gift was made nor before March 15th of the following year. However, in January of 1943, after separate returns of income had been filed by him and his wife and their right to divide the income had been questioned by the Commissioner, a gift tax return was filed. Beginning in April 1941 Dorothy Binford was paid by check $215 per month out of the business. These payments were charged to an account in her name *167 set up on the books of the business. At the end of the year the bookkeeper made entries in the books dividing the net income between petitioner and Dorothy, crediting one-half to each of them. Dorothy had her own separate bank account in which her checks were deposited. She did not have a joint bank account with her husband. No amount other than the $215 per month was paid over to Dorothy during 1941, the income for that year being used in improving the premises and in the reduction of mortgage indebtedness. The drawing account of $215 per month had been directed by petitioner to be paid to Dorothy. Petitioner did not have a drawing account. He drew funds from the business as they were needed by him for some business purpose. Dorothy used her funds for her own purposes. Petitioner paid the family and living expenses. By the bookkeeping entries made at the end of 1941 the profits from Jack and Jill's Tavern were prorated on a monthly basis. All of the income for the first three months (not actually computed but prorated) was credited to petitioner and the balance was divided between him and his wife. At that time the funds which the wife had received after April were charged to *168 her account and the additional profit was credited to her account. Petitioner and his wife filed separate income tax returns for the year 1941, including the amounts, computed as shown above, in gross income. In computing the deficiency respondent included in petitioner's gross income all of the net profits from Jack and Jill's Tavern for the year 1941. The fair market value of the land and buildings upon which the tavern is located, an undivided interest in which was conveyed by petitioner to his wife, was, in 1941, $15,000 and a reasonable annual rental for said property was $1,500. Opinion This is another of the increasing number of cases in which it is sought to avoid the rationale of Lucas v. Earle, 281 U.S. 111, and escape tax upon income by apparently going through the form of transferring title to the property producing it. Blair v. Commissioner, 300 U.S. 5. Many of the recently decided cases are set out in the several opinions - majority, concurring and dissenting - filed in Camiel Thorrez, 5 T.C. 60 (promulgated May 21, 1945) and the applicable principles are thoroughly discussed. It would serve no useful purpose to set out *169 or attempt to re-state them here. This much is clear - each case must be decided upon its own facts and the issue presents a mixed question of law and of fact, sometimes quite difficult to resolve. Cf. Dobson v. Commissioner, 320 U.S. 489; Commissioner v. Scottish American Inv. Co., 323 U.S. 119; Bingham's Estate et al. v. Commissioner, 325 U.S. 365 (June 4, 1945). The ultimate conclusion reached under the facts shown in our findings is that one-half of nine-twelfths of the reasonable rental value of the two acres of ground and the tavern building located thereon [1] or $562.50 of the income from the business was properly included in the wife's income as rental and that the remainder of the amount included by respondent in petitioner's gross income ($7,085.09, of which $124.45 is not in issue) was properly included. While it is always difficult to rationalize a fact question, some of the evidence and circumstances will be alluded to briefly. In Daniel J. Fry, 4 T.C. 1045, we recently set out the generally recognized essential elements of a valid inter vivos gift. Several are lacking here. *170 No formal conveyance was made so we must rely entirely upon the oral evidence. Petitioner stated that "from the beginning" - whether he meant in 1933 or at the time of the marriage is not clear - he had "assured her that everything * * * [he] had was hers." "As men sometimes do with their wives" he did not quite "live up to his promise." "So in 1940 I actually made a gift to her then but there again it was not really effected legally so that we might claim any benefits until April 1941 * * *." At that time he told his brother, who was operating the business, "that in the future he was not only holding for me but for her and that the profits now would not go only to me but she would take her share as an owner of a half interest in the business, as an equitable owner of a half interest in the business; that she should receive one-half of the profits." The bookkeeper was told substantially the same. We cannot spell out of this "a clear and unmistakable intention on the part of the donor to divest himself absolutely and irrevocably of the title, dominion and control" of half of the business in praesenti nor as an "irrevocable transfer of the present legal title and of the dominion and *171 control of the entire gift to the donee" (of any more than the income). He had made no actual delivery to the donee "of the subject of the gift or of the most effectual means of commanding the dominion of it" nor had he placed himself in the position where he could no longer "exercise dominion or control over it." The most that he did was to divide the profits; but even that could have been undone by him at any time. We are therefore of the opinion that no valid gift of an interest in the business was made. It is not entirely clear whether petitioner is contending that his wife actually owned one-half of the business for services rendered before the marriage or not; but, if so, respondent's suggestion upon brief is not without merit. Therein it is said, inter alia: "No man could have given her more than petitioner did from 1933 until their marriage in 1936 - a home, living expenses, companionship and a promise of marriage, which laid the foundation for a happy and luxurious domestic life. * * * She was all the time the recipient of petitioner's largess, first as his fiancee and then as his wife." In any event the evidence falls far short of establishing that she had any real financial *172 interest in the business prior to the marriage. Petitioner evidently considered that she had none; for in the bill of sale executed by him to his brother just a couple of months prior to the marriage he covenanted that he was "the lawful owner of said goods and chattels; that they are free from all encumbrances; and that * * * [he had] good right to sell" them. The evidence with reference to the value of the half interest in the real estate and the reasonable rental value thereof leaves much to be desired. In petitioner's gift tax return he valued the land at $1,700 and the buildings at $11,168.94, a total of $12,868.94. Other evidence considered by us as tending to establish a higher value consists of statements to the effect that the bookkeeper had been instructed to set up rental equal to 15 percent of the gross profits. This would indicate a higher value for the real estate and a larger amount than we have found to be a reasonable rental. However, the fiduciary returns filed by Earl do not indicate that any rental was ever deducted. On the other hand the depreciation claimed by him - erroneously we believe - together with the repairs, replacements, insurance, etc., aggregate *173 approximately the amount which we have found to be reasonable annual rental, i.e. $1,500 per annum. Since the deed to the wife was executed in April of the taxable year we have concluded that an allocable portion of the rent constituted gross income to her and, to that extent, was erroneously included in petitioner's gross income. Upon brief the parties discuss at some length whether Earl was a trustee or a mere agent. We incline to the view that he was the latter; but as we view it the question is not important. If a real trust had been created the income was payable to the grantor under section 22 (a), section 166 and section 167 I.R.C. If it be assumed that the trust had been altered or modified to require payment of half of the income to petitioner's wife the income was probably nevertheless taxable to him under Helvering v. Clifford, 309 U.S. 331. Cases decided by the Supreme Court of Oregon and cited by petitioner upon brief to establish that an oral trust may be recognized, that a wife may own separate property, that each spouse is considered to be the owner of one-half of the jointly owned property and the income belongs to them in the *174 same proportion, and that a valid gift may be made by one spouse to the other, have been examined but are not particularly helpful. Cases decided by this tribunal in which valid gifts were held to have been made are likewise of small aid. In none cited were the facts even closely analogous to the facts now before us. The respondent erred in including in petitioner's gross income $562.50. His determination is otherwise approved. Decision will be entered under Rule 50. Footnotes
1. 1/2 X 9/12 X $1,500 = $562.50.↩